IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MICHAEL I. KROLL, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | 1:16-cv-704 (LMB/IDD) |
| ) | |
| MICHELLE LEE, Undersecretary of Commerce ) | |
| for Intellectual Property and Director of the ) | |
| United States Patent and Trademark Office, ) | |
| ) | |
| Respondent. ) | |
| ) | |

## MEMORANDUM OPINION

Michael I. Kroll, Esq. ("petitioner" or "Kroll"), has filed a document styled a "Complaint" [Dkt. 1] alleging that he was improperly suspended from practicing as a patent attorney before the United States Patent and Trademark Office ("USPTO").[1] The USPTO has responded by treating Kroll's complaint as a petition for review, citing Local Civil Rule 83.5, which provides that a "person refused recognition to practice or suspended . . . from practice before the [USPTO] may seek judicial review of such action by filing [in this court] a petition" for review (emphasis added). "Response to Petition for Review" ("Resp.") [Dkt. 26]. After obtaining leave of Court, Kroll filed an Opposition[2] ("Opp.") [Dkt. 33] and a Supplemental Submission in opposition ("Supp.") [Dkt. 35]. The Court has found that oral argument would

---

[1] Although Kroll has signed all of his pleadings as "Attorney and Plaintiff, Pro Se," after briefing was completed he filed a "Certification of Receiving Assistance of Counsel" explaining that in preparing his briefs he had received the assistance of an attorney, Edwin D. Schindler, Esq., who has subsequently been admitted pro hac vice. Accordingly, Kroll is not entitled to the deference accorded to pro se litigants.

[2] In fact, Kroll styled this document "Opposition to Defendant's Motion to Dismiss," despite the respondent not having filed a motion to dismiss.

not aid the decisional process, and for the reasons that follow, will treat this civil action as a petition for review, which will be denied.

## I. FACTUAL BACKGROUND

Kroll, who was represented throughout the administrative process by counsel,[3] has not challenged the respondent's factual findings in the agency proceedings, which this Court accordingly adopts. See Final Order, [Dkt. 1-1] at 13–20.

Kroll is an active member of the New York State Bar and has been a registered patent attorney since December 6, 1973, with nearly 80 percent of his work occurring before the USPTO. Id. at 13. He also maintains several websites, on which he posts his clients' inventions "in hopes of attracting potential buyers or investors." Id. Since 1973, he has been generally aware that an invention cannot be patented "if the invention is described in a written publication [or placed on sale] more than one year before filing a patent application on the invention[,]" id. at 12–13; see also 35 U.S.C. § 102(b), and he concedes that placing an invention on his website constitutes publicly describing an invention or placing it on sale, Final Order, [Dkt. 1-1] at 14. Accordingly, Kroll normally waits to post an invention on his website until after he has filed a patent application with the USPTO for that invention. Id. at 15.

In his patent practice, Kroll did not have an automated system to remind him of upcoming deadlines; rather, he manually entered deadlines into a docket sheet, which he manually searched to keep track of dates. Id. at 14. He also maintained his files in "approximately 125 five-drawer filing cabinets." Id. Although the drawers themselves were organized by the client's last name, the files within the drawers were not kept in an organized

---

[3] The attorney who represented him, Edwin D. Schindler, Esq., is the same "shadow" attorney who assisted Kroll in drafting multiple pleadings in this civil action before he was admitted to practice pro hac vice.

2

fashion. Id. At least one cabinet was labeled "Applications in Process/Ready to be Filed," in which Kroll kept applications before they were filed. Id. When an application was in fact ready to be filed, Kroll or one of his employees would pull the file from that cabinet, file the application with the USPTO, and then return the file to the "Ready to be Filed" cabinet until the USPTO confirmed receipt of the application. Id. at 15. Once the confirmation from the USPTO arrived, the file would then be moved to the alphabetical cabinets to await the USPTO's final decision. Id.

In 2001, Kroll first met with Adil Sersh ("Sersh") about representing Sersh in connection with an application for a patent for a traffic control device that Sersh had invented. Id. at 5. In 2004, Sersh paid Kroll $8,000 to prosecute the patent application. Id. By October 15, 2005, Sersh provided Kroll with all the necessary documents for the application, which Kroll prepared but did not file. Id. at 16. Instead, on December 3, 2005, Kroll listed the traffic control device for sale on one of his websites, marking it as "U.S. Patent: Pending" even though he had not filed the patent application. Id. After Kroll listed the device, Sersh's file was placed in the "S" cabinet, a deviation from Kroll's system of placing files in the alphabetical cabinet only after the USPTO has confirmed receipt of a patent application. Id. Throughout this period, Kroll "took no action to confirm whether the traffic control device application had been filed with the USPTO," id., and he failed to "file a patent application for the traffic control device within 12 months of his posting the invention for sale on his" website, id. at 17.

Nearly two years later, in August 2007, Kroll found Sersh's application "by chance," and realized it should have been, but had not been, filed with the USPTO. Id. Without checking his website to determine if the invention appeared there, or conducting "any additional investigation into the invention's patentability," Kroll filed the application ("the '052

3

application") for Sersh's traffic control device on August 13, 2007, and informed Sersh that he had done so. Id. At the time of filing, Kroll knew that a patent attorney, by filing "any paper" with the USPTO, certified to the best of his knowledge "formed after an inquiry reasonable under the circumstances that . . . the claims and other legal contentions therein are warranted by existing law[.]" Id. at 14; 37 C.F.R. § 10.18(b) (2004).[4]

On December 28, 2009, the USPTO sent Kroll an "Office Action" raising written description and obviousness concerns about the '052 application, which required further response for the application to proceed. Final Order, [Dkt. 1-1] at 17; [Dkt. 18-2] at 85–97. Kroll informed Sersh about the Office Action, requested a $2,375 fee to respond to it, and alerted Sersh that failure to respond would constitute abandonment of the application. Final Order, [Dkt. 1-1] at 17–18. Sersh did not respond, Kroll did not contact him again, and no response to the Office Action was filed. Id. at 18. Consequently, the USPTO sent Kroll a Notice of Abandonment for the '052 application on July 7, 2010, about which he did not inform Sersh. Id.

Kroll has had other run-ins with disciplinary authorities both before and after the incident that gave rise to this proceeding. In 2004, the USPTO suspended him from practice for three years for charging an excessive fee, giving false or misleading information to the USPTO, and creating false evidence, although this suspension was "stayed pending compliance with the terms of a settlement agreement[.]" Id. at 19. The New York Supreme Court publicly censured him in 2006, reminding him "not to neglect patent applications[.]" Id. at 18. In 2010, the USPTO suspended him for 60 days for permitting an application to be abandoned by failing to inform the

---

[4] The applicable regulations were replaced in 2013. All references to the Code of Federal Regulations in this Memorandum Opinion are to the edition in effect at the time of the applicable conduct.

4

USPTO that foreign patent applications for the same invention had been filed. Id. at 19. This suspension, too, was stayed. Id.

On February 28, 2014, based on Kroll's handling of the Sersh application, the director of the USPTO's Office of Enrollment and Discipline filed a disciplinary complaint alleging ten violations of the USPTO Rules of Professional Conduct. Id. at 20. On April 24, 2015, an administrative law judge ("ALJ") found that three violations had been proven: (1) engaging in disreputable or gross misconduct in violation of 37 C.F.R. § 10.23(a); (2) signing a paper filed with the USPTO without first conducting a reasonable inquiry in violation of 37 C.F.R. §§ 10.18 and 10.23(a); and (3) neglecting a legal matter entrusted to him in violation of 37 C.F.R. § 10.77(c). Id. at 21. Considering these violations and Kroll's disciplinary history, the ALJ imposed a two-year suspension. Id. at 21–22.

Kroll appealed to the Director of the USPTO, who affirmed the ALJ on March 4, 2016, id. at 35, and denied reconsideration on May 18, 2016, id. at 8. The order denying Kroll's motion for reconsideration informed him that he had 30 days from the date of that order to seek judicial review of his suspension. Id. Kroll filed his "complaint" in this court on June 21, 2016. [Dkt. 1].

## II. DISCUSSION

As an initial matter, the parties disagree over the nature of this civil action and, consequently, the appropriate standard of review. The USPTO argues that it is appropriately characterized as a "petition for review" under 35 U.S.C. § 32 and this court's Local Civil Rule 83.5, and that a deferential standard of review applies. Kroll argues that the procedures set out in § 32 and Rule 83.5 are unconstitutional and that this dispute should be treated like any other civil complaint filed in this court in the first instance and be reviewed de novo.

5

On the merits, Kroll contends that he cannot be suspended unless he violated the USPTO's practice rules with wrongful intent. Respondent argues that Kroll's complaint was untimely and that the rules in question do not, and need not, include any wrongful intent requirement.

### A. **Appropriate Procedure and Standard of Review**

Congress has established the procedure by which a patent attorney may be suspended from practice in 35 U.S.C. § 32, which provides that the USPTO "Director may, after notice and opportunity for a hearing, suspend . . . from further practice before the [USPTO] any person . . . shown to be incompetent or disreputable, or guilty of gross misconduct, or who does not comply with the regulations [governing patent attorneys promulgated by the USPTO]." If the suspended person wishes to challenge the Director's determination, the "United States District Court for the Eastern District of Virginia, under such conditions and upon such proceedings as it by its rules determines, may review the action . . . upon the petition of the person" suspended. Id.

Acting on this congressional grant of authority, this court adopted Local Civil Rule 83.5, which permits a party aggrieved by the USPTO's disciplinary procedure to file a petition for review "within 30 days after the date of the order recording the Director's action." Review of a USPTO suspension order is conducted under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., meaning the order will only be set aside if the petitioner can establish that the order was "arbitrary, capricious, or otherwise unlawful" under the APA's "'highly deferential'" standard. Changanti v. Lee, 187 F. Supp. 3d 682, 690 (E.D. Va. 2016) (quoting Ohio Valley Envtl. Coal v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009). The Federal Circuit has approved this procedure and confirmed that the APA supplies the correct standard of

review. Bender v. Dudas, 490 F.3d 1361, 1365–66 (Fed. Cir. 2007). Accordingly, the procedures for judicial review of the order suspending Kroll are clearly established.

### B. Challenges to the Review Procedure

Kroll nevertheless raises a series of challenges to these procedures, arguing that they contravene the Constitution or other federal law. Each of those challenges fails.

First, Kroll argues that Local Rule 83.5 violates the Federal Rules of Civil Procedure ("FRCP") by depriving him of the "motion practice and presentation of legal questions and factual issues" authorized by the FRCP. [Dkt. 1] ¶ 48. As respondent correctly points out, this argument fails because Local Rule 83.5 has not been enacted under the Rules Enabling Act, 28 U.S.C. § 2072, but under a separate grant of statutory authority—35 U.S.C. § 32—which permits this court to conduct review "under such conditions and upon such proceedings as it by rules determines[.]" That language does not require that the conditions and rules adopted for processing USPTO suspension challenges comport with the FRCP.

Kroll next contends that 35 U.S.C. § 32 and Local Rule 83.5 violate Article III by depriving him of "an Article III forum for the consideration of legal questions or factual determinations[.]" [Dkt. 1] ¶ 49. Relying on the Supreme Court's decisions in Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), and Stern v. Marshall, 564 U.S. 462 (2011), he argues that an Article III court must make the initial factual determinations and legal conclusions required to sustain his suspension. This argument entirely divorces Northern Pipeline and Stern from their context. Both cases involved a bankruptcy court's adjudication of traditional common law causes of action, Northern Pipeline, 458 U.S. at 56 (breach of contract); Stern, 564 U.S. at 469 (tort), and both recognized that another category of disputes over "public rights" exists, which Congress "'may or may not bring within the

cognizance of the courts of the United States, as it may deem proper,'" Stern, 564 U.S. at 488–89 (quoting Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 284 (1856)). The public rights category includes "cases in which the claim at issue derives from a federal regulatory scheme[.]" Stern, 564 U.S. at 490.

Although the precise boundaries of the public rights doctrine are not fully delineated, this case is not close to the line. Kroll's right to practice before the USPTO unquestionably "derives from a federal regulatory scheme" because the qualifications to practice as a patent attorney are comprehensively established by federal regulations, see 37 C.F.R. § 1.31 et seq., meaning that Article III imposes no limit on Congress' ability to assign adjudication of that right to the executive branch in the first instance. See Stern, 564 U.S. at 490. Accordingly, the procedures established by 35 U.S.C. § 32 and Local Rule 83.5 do not violate Article III.[5]

## C. Untimeliness

Respondent argues that Kroll's petition was untimely filed under Local Rule 83.5 because it was filed more than 30 days after the date of the order denying reconsideration. It is well-accepted that "a district court has discretion to adopt local rules that are necessary to carry out the conduct of its business[,]" Frazier v. Heebe, 482 U.S. 641, 645 (1987), and that in the context of patent attorney suspensions Congress has separately authorized this court to conduct review "upon such conditions and upon such proceedings as it by its rules determines," 35

---

[5] Kroll raises essentially the same argument under several other constitutional guises. See [Dkt. 1] ¶ 49 ("Local Civil Rule 83.5 deprives plaintiffs, including Kroll, of an Article III forum . . . and thereby constitutes a violation of due process contrary to the Due Process Clause of the Fifth Amendment."); ¶ 47 ("Local Civil Rule 83.5 constitutes a violation of 'Separation of Powers' and the Non-Delegation Doctrine by delegating authority to resolve legal questions and factual issues to an administrative agency of the Executive Branch[.]"). Because the public rights doctrine establishes that Congress was well within its rights to delegate to the USPTO fact-finding regarding a person's eligibility to practice before it, these challenges fail for the same reasons as Kroll's Article III claim.

8

U.S.C. § 32. Acting on that authorization, this court has required that a petition for review of a USPTO suspension order be filed "within 30 days after the date of the order recording the [USPTO] Director's action." Local Civ. R. 83.5. Kroll filed his "complaint" on June 21, 2016, 34 days after the date of the order denying reconsideration of his suspension. Kroll makes no attempt to justify his tardiness in either his Opposition or Supplemental Submission. Accordingly, the petition was untimely filed and could be dismissed for that reason alone. In the interest of completeness, the Court will nevertheless address the merits of Kroll's challenges to the regulations which he was found to have violated.

### D. Absence of Bad Faith

Kroll first argues that 37 C.F.R. § 10.23, which makes it a violation of the USPTO's Rules of Professional Conduct to file a signed paper in violation of 37 C.F.R. § 10.18, must incorporate an "intent requirement" to conform with Federal Circuit case law, and that he lacked a "deceitful or deceptive motive" or an "intent to enrich himself at the expense of the client[.]" Pet. Opp. 10. This view is mistaken.

Under the regulatory scheme in effect at the time, 37 C.F.R. § 10.18 provided that any person who filed a signed paper with the USPTO was deemed to certify, among other things, that the claims in that paper were formulated after a reasonable inquiry. Another regulatory provision, 37 C.F.R. § 10.23, made it misconduct for a practitioner to sign a paper "in violation of the provisions of § 10.18." Accordingly, filing a signed paper without having in fact conducted a "reasonable inquiry" was "in violation of" § 10.18 and therefore misconduct under § 10.23. The only scienter requirement built into this scheme is that the accused know that he has filed a signed paper without conducting a reasonable inquiry; there is no additional intent requirement on the face of the regulations.

9

Kroll's argument that there must be an additional implied "intent requirement" hinges on his reading of Klein v. Peterson, 866 F.2d 412 (Fed. Cir. 1989), but Klein was a case about an entirely different set of alleged disciplinary violations, some of which already had an intent requirement in the regulation. Id. at 413. Importantly, Klein offers no general guidance about whether the rules of practice must always include an intent requirement. See generally id. Kroll then muddies the waters by arguing that alleging a § 10.23 violation is tantamount to alleging a "false certification," words which appear nowhere in the regulation, and that a "false certification" charge is the "legal and functional equivalent" of the "inequitable conduct" doctrine, which requires "intent to deceive." Pet. Opp. 11–12 (emphasis omitted). This chain of reasoning is specious, given that the "inequitable conduct" doctrine cited by the petitioner in his Opposition refers to a defense to patent infringement and has nothing to do with the rules of practice for patent attorneys. See Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011). Accordingly, there is no basis for Kroll's claim that 37 C.F.R. § 10.23 included a wrongful intent requirement.[6] Because Kroll admits that he conducted no inquiry at all, much less a reasonable one, into the traffic device's eligibility for a patent when he filed the application, respondent's conclusion that Kroll violated § 10.23 was neither arbitrary nor capricious.

Kroll similarly attempts to read an "intent requirement" into 37 C.F.R. § 10.77(c)'s prohibition of a practitioner neglecting a legal matter entrusted to him. For this argument, he relies on an Informal Opinion of the American Bar Association ("ABA") Committee on Ethics and Professional Responsibility, claiming that the USTPO has adopted the ABA's Disciplinary

---

[6] To the extent that Kroll relies on the American Bar Association's Model Rules of Professional Conduct, his arguments fail because the Model Rules are obviously not a source of legal authority.

Rules by citing to a March 23, 2016 statement on the USPTO's website that the USPTO had adopted a new Code of Professional Responsibility to conform to the ABA's Model Rules. See Pet. Opp. 12. This argument fails for several reasons. First, the USPTO cannot adopt binding regulations through a press release on its website. Second, the statement apparently addresses a set of professional rules adopted after petitioner engaged in the conduct that is the subject of this civil action, meaning those rules are inapplicable to his case. Third, the ABA's informal decisions do not bind the USPTO or this Court. Finally, the cited Informal Decision states only that a finding of neglect requires a showing of more than just "an error of judgment made in good faith," see Pet. Opp. 13, but does not require an affirmative showing of bad intent to find neglect. Indeed, it would defy one of the oldest definitions known to the law to insist that finding neglect requires finding bad intent, see "Neglect," Black's Law Dictionary (10th ed. 2014) (observing that the definition of "neglect" as the "omission of proper attention to a person or thing, whether inadvertent, negligent, or willful" dates to the 16th Century (emphasis added)).

In short, none of the regulations at issue required the USPTO to establish "intent to deceive" or any other form of "bad intent," nor did any controlling authority require the regulations to incorporate such a standard. Accordingly, the suspension order is based on proper legal standards using the appropriate statutory and regulatory framework, and petitioner has not challenged respondent's factual findings, which this Court finds were fully supported by the record.

### III. CONCLUSION

Given that Kroll has not challenged the respondent's factual findings and this Court's finding that the respondent applied the correct legal standards, the petition for review will be denied by an appropriate Order to be issued with this Memorandum Opinion. Kroll's counsel,

Edwin D. Schindler, Esq., had also filed a "Request for Clarification Concerning Local Civil Rule 83.1(M);" however, because he has been subsequently admitted pro hac vice after obtaining local counsel, this request will be denied as moot.

Entered this 22 day of May, 2017.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge